BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
PATRICIA N. SYVERSON (203111)
600 W. Broadway, Suite 900
San Diego, California 92101
Telephone:     619-798-4593
psyverson@bffb.com

BONNETT, FAIRBOURN, FRIEDMAN
  & BALINT, P.C.
ELAINE A. RYAN (*To Be Admitted Pro Hac Vice*)
CARRIE A. LALIBERTE (*To Be Admitted Pro Hac Vice*)
2325 E. Camelback Rd. Suite 300
Phoenix, Arizona 85016
Telephone:     602-274-1100
eryan@bffb.com
claliberte@bffb.com

*Attorneys for Plaintiff*
*Additional counsel on signature page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD LUPARELLO, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD FINANCIAL LLC, a Delaware corporation; ROBINHOOD SECURITIES, LLC, a Delaware corporation; and ROBINHOOD MARKETS, INC., a Delaware corporation,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Edward Luparello brings this class action lawsuit against Defendants Robinhood Financial LLC; Robinhood Securities, LLC; and Robinhood Markets, Inc. ("Defendants" or "Robinhood"), on behalf of himself and all others similarly situated and alleges, based upon personal knowledge, information and belief, and the investigation of his counsel as follows:

**NATURE OF ACTION**

1.      Robinhood is a multi-billion dollar mobile application and website investment service that places stock trade orders on behalf of users like Plaintiff and Class members. Robinhood targets young adults who are new to investing through youth-forward marketing and a video game-like interface and misleads them into using Robinhood by promising "commission-free" and "discounted" trading services and assuring them in its Customer Agreements that all of Robinhood's transactions will be subject to federal and state securities laws.  Robinhood offers "commission-free" trading services to encourage more trades as it is paid more if its customers trade more.  As a retail broker-dealer, Robinhood is duty-bound to obtain the most favorable trade terms and prices possible – *i.e.*, the duty of "best execution."

2.      Unbeknownst to Robinhood's unsuspecting and largely unsophisticated customers, from September 1, 2016 to June 16, 2020 (the "Class Period"), Robinhood breached its duty of best execution, accepted less price improvement for its customers' trades than what the principal trading firms were offering in exchange for a higher rate of payment for order flow for itself, misrepresented its receipt of such payments and the execution quality of its trades, omitted material revenue information from its website and other communications with its customers, and covered up its order flow payments (payments received from trading firms, such as broker-dealers, for directing customer orders to them) and poor execution quality.

3.      Capitalizing on its customers' naivete and placing its financial interests ahead of its duty of best execution and duty of undivided loyalty to its customers, Robinhood negotiated "payments for order flow" ("PFOF"), four times the industry standard from the principal trading firms through which Robinhood routed its customers' orders, which the principal trading firms recouped from each and every one of Robinhood's clients by providing them no price

improvement or less price improvement on their trades, which they otherwise could have obtained had Robinhood acted lawfully.  Robinhood did not disclose that it generates most of its revenue from PFOF, the terms of those arrangements, or the pass-through of those PFOF to customers in the form of less favorable trade execution prices.  Robinhood enjoyed huge profits from the "dark-pool" PFOF arrangements.  Robinhood's customers were harmed in that Robinhood's PFOF caused them to receive inferior execution prices than, and not the best execution prices that they were entitled to by law.

4.     Not only did Robinhood fail to disclose its PFOF until late in the Class Period and never disclosed their negative impact on the execution quality of its customers' trades, but Robinhood took affirmative steps to cover up its high PFOF and resulting poor execution quality by misrepresenting that Robinhood's PFOF revenue was "indirect" and "negligible," that if PFOF ever became a direct and significant source of revenue it would inform customers, and its execution quality and speed "matches or beats what's found at other major brokerages[,]" when Robinhood was aware that all of these material representations were not true.

5.     Robinhood's material omissions, misrepresentations, and concealment of its PFOF arrangements and the inferior execution prices they caused was a breach of Robinhood's fiduciary duty to Plaintiff and the Class and violated section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; California's Corporations Code §§ 25401 and 25504.1; California's Consumer Legal Remedies Act, Civil Code §§ 1750, *et seq.*; and California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*

6.     Plaintiff seeks damages and restitution on behalf of himself and the class.

**JURISDICTION AND VENUE**

7.     This Court has original jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.* This Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(a), because the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and this is a class action in which there are numerous Class members who are citizens of states different from Defendants.

8.      This Court has personal jurisdiction over Defendants, whose principal place of business is in this District, who are citizens of California and conduct business in California, including the Northern District, and a substantial portion of the acts complained of herein took place in California.

9.      Venue is proper in the Northern District of California because Defendants systemically and continuously conduct business in this District, and many of the events that give rise to Plaintiff's claims occurred in this District.

## PARTIES

10.      Plaintiff Edward Luparello resides in and is a citizen of Santa Barbara, California. Plaintiff is 32 years old and falls within Robinhood's target market.  On or around December 5, 2017, Plaintiff began using Robinhood for brokerage services. Plaintiff chose to use Robinhood because, among other things, he read that Robinhood achieved best execution on client trade orders. Plaintiff relied on Robinhood's represented compliance with its duties of best execution and that all investment transactions would be made in compliance with state and federal law as stated in Robinhood's Customer Agreements, and Plaintiff reasonably expected Robinhood would comply with its duty of best execution, duty of undivided loyalty to him, duty to fully disclose to him all material facts, duty to refrain from acting adverse to his best interests, and duty to act in good faith.  Plaintiff did not know about Robinhood's PFOF arrangements and their adverse effect on his trade execution prices.  Plaintiff could not have learned from any publicly available source how much price improvement he lost on his orders as a result of Robinhood's actions. Had Plaintiff known that Robinhood had negotiated substantial PFOF for itself which diminished the execution quality of his trades, Plaintiff would not have utilized Robinhood's brokerage services.  As a result of Robinhood's PFOF arrangements and breach of its duty of best execution, Plaintiff incurred losses on all trades he executed during the Class Period, which amount to hundreds of trades – including, for example, 115 trades in July 2019 alone. Plaintiff was also injured because Robinhood's public misrepresentations and poor execution quality impugned the integrity of the trade executions by, among other things, adversely affecting the prices he and the

Class members received on their investments. Plaintiff did not know of Robinhood's PFOF arrangements, their adverse effect on the price improvements realized on his trade orders, and that Robinhood was not fulfilling its best execution duties on his behalf, until such facts became publicly available.  The amount of Plaintiff's losses can be determined through documents in Robinhood's possession and expert analyses of same, as further evidenced by the allegations in paragraph 28, below.

11.     Defendant Robinhood Markets, Inc. is a financial service holding company incorporated in Delaware with its principal place of business located at 85 Willow Road, Menlo Park, CA 94025.  It is the holding company for Defendants Robinhood Financial LLC and Robinhood Securities, LLC.  Defendant Robinhood Markets, Inc. is a named party to the Robinhood Terms & Conditions Agreement governing Robinhood's website and mobile applications.[1]  Defendant Robinhood Markets, Inc. facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiff and Class members  and concealed their detrimental effect on the execution prices Plaintiff and Class members realized on their trade orders.

12.     Defendant Robinhood Financial LLC is a full-service securities firm incorporated in Delaware with its principal place of business located at 85 Willow Road, Menlo Park, CA 94025.  Defendant Robinhood Financial LLC is a wholly owned subsidiary of Defendant Robinhood Markets, Inc., and an affiliate of Defendant Robinhood Securities, LLC.  It is an "introducing" broker-dealer, offering brokerage services to retail investors and allowing customers to open online accounts and electronically deposit funds.  It is a named party to the Robinhood Terms & Conditions Agreement governing Robinhood's website and mobile applications.  It is also a party to the Robinhood Customer Agreements[2], governing the purchase,

---

[1] www.robinhood.com/us/en ("Robinhood means Robinhood Markets and its in-application and web experiences with its family of wholly owned subsidiaries which includes Robinhood Financial, Robinhood Securities, and Robinhood Crypto").
[2] Current version available at https://cdn.robinhood.com/assets/robinhood/legal/Robinhood%20Customer%20Agreement%20(June%2022)%20(1).pdf.

sale, or carrying of securities or contracts relating thereto and/or the borrowing of funds. Defendant Robinhood Financial LLC facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiff and Class members and concealed their detrimental effect on the execution prices Plaintiff and Class members realized on their trade orders.

13.     Defendant Robinhood Securities, LLC is a full service securities firm incorporated in Delaware with its principal place of business located at 85 Willow Road, Menlo Park, CA 94025.  It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc., and an affiliate of Defendant Robinhood Financial LLC.  Once a customer creates an account with Robinhood Financial LLC, Defendant Robinhood Securities is the custodian of customers' funds and the securities customers purchase.  It services customer accounts; executes, clears, and settles customer trades; prepares and distributes customer account statements and trade confirmations; and extends credit to customer margin accounts.  It is a party to the Robinhood Customer Agreements governing the purchase, sale, or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared through it.  Defendant Robinhood Securities, LLC facilitated, participated in, and communicated the PFOF misrepresentations and omissions to Plaintiff and Class members and concealed their detrimental effect on the execution prices Plaintiff and Class members realized on their trade orders.

## FACTUAL ALLEGATIONS

### A.     Robinhood's Broker-Dealer Customer Duties.

14.     Robinhood is one of the largest retail broker-dealers in the United States.  It offers self-directed securities brokerage services to customers through its website and smartphone applications.  Robinhood is a Commission-registered broker-dealer and a member of the Financial Industry Regulation Authority ("FINRA").

15.     Robinhood began offering retail brokerage accounts to the general public in March 2015, targeting young adults new to investing by promising "discount" and "commission-free" services.  By November 2020, Robinhood had 13 million approved customer accounts.

16.     The average age of Robinhood's customers is 28-41, and many of them use Robinhood to make their first stock purchase.

17.     When Robinhood receives a trade order from a client, it routes the order to a venue for execution. In so doing, it owes a duty of loyalty to act in its customer's best interest and operates under a duty of best execution, which encompasses, among other things, a duty to act exclusively in its customer's best interests and use reasonable diligence to execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible seek price improvement to obtain the best price available (as discussed in paragraph 20, below).   To fulfill its duty of best execution, Robinhood must undertake regular and rigorous reviews of the quality of its customer order executions, which includes benchmarking its execution quality against competitor broker-dealers to determine whether it is obtaining the best terms reasonably available for customer orders.

18.     Rather than sending customer orders directly to national exchanges, Robinhood routes its customers' orders to Robinhood Securities for clearing and further routing to principal trading firms.  These principal trading firms then attempt to profit from executing large volumes of retail buy and sell orders by either taking the other side of customer orders and exiting the positions at a profit ("internalization"), or by routing the orders to other market centers.

19.     In order to execute large order volumes and grow a guaranteed supply of liquidity in their markets, principal trading firms offer incentives to broker-dealers like Robinhood to send them order flow.  One such incentive is PFOF.  Robinhood has received PFOF throughout the Class Period in exchange for routing its customer orders to principal trading firms.  SEC rules permit PFOF so long as it does not interfere with Robinhood's best execution duties and Robinhood discloses the arrangement in its quarterly reports filed pursuant to 17 CFR § 242.606.

20.     Another incentive that principal trading firms provide to retail broker-dealers is "price improvement," where a customer order receives an execution price that is superior to the best available quotation then appearing on the public quotation feed.  For example, a "buy" order may be executed at a lower price than the lowest prevailing bid.  Price improvement creates a

financial benefit for the customer, and most retail broker-dealers obtain price improvement on the vast majority of customer orders that they send to principal trading firms.

21.     Unlike price improvement, PFOF has the potential to create a conflict of interest between broker-dealers like Robinhood and their customers, because PFOF is a benefit that goes to the broker-dealer itself, and not the customer.   Accordingly, Robinhood's duty of best execution requires that it not allow PFOF to interfere with its efforts to secure the most favorable execution prices and trade terms for its customers.

22.     During the Class Period, Robinhood negotiated PFOF arrangements with principal trading firms that significantly reduced the price improvement its customers received. Robinhood did not disclose its PFOF and the adverse effect the payments had on the price improvement customers received.   Instead, Robinhood misrepresented that its execution quality and speed exceeded those of other brokerages.

**B.      Robinhood's Exorbitant PFOF Arrangements.**

23.     When Robinhood first began providing broker-dealer services to the public, it routed client orders to another broker-dealer to provide both clearing and order execution services.   That broker-dealer then routed the orders to principal trading firms, received PFOF from those firms, and shared a portion of that revenue with Robinhood.

24.     In early 2016, Robinhood decided to start routing customer orders through Robinhood Securities directly to principal trading firms in order to earn additional PFOF revenue. During negotiations with various principal trading firms, Robinhood was told that, if Robinhood wanted more PFOF revenue, it would have to accept less price improvement for its customers. Robinhood was also told that other large retail broker-dealers typically receive four times as much price improvement for customers as they do PFOF for themselves – an 80/20 split in favor of price improvement.   Nevertheless, Robinhood negotiated the exact opposite split, with 80% of the value going directly to it in the form of PFOF, and only 20% going to its customers in the form of price improvement. In mid-2017, when one of the principal trading firms told Robinhood

it would no longer agree to pay Robinhood's high PFOF rates, but would pay a lower rate, Robinhood stopped routing customer orders to that firm.

25.     Robinhood's laser focus on obtaining the highest PFOF interfered with its duty of best execution.  *See* Battalio, *et al.*, *Can Brokers Have it All? On the Relation between Make-Take-Fees and Limit Order Execution Quality*, Dec. 15, 2013, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2367462 (last visited Jan. 14, 2021); *see also Schwab v. E\*Trade Fin. Corp.*, 258 F. Supp. 3d 418, 427 (S.D. N.Y. 2017) ("a broker-dealer's focus on obtaining the highest amount of PFOF tends to interfere with best execution"). As noted at a hearing before the Permanent Subcommittee on Investigations of the Senate's Committee on Homeland Security and Governmental Affairs by Joseph Brennan, the Vanguard Group's Head of Global Equity Index Group, some broker-dealers, like Vanguard, do not accept order flow payments because of the inherent conflict of interest that such payments automatically produce. *See also* CFA INSTITUTE, *Payment for Order Flow, Internalisation, Retail Trading, Trade-Through Protection, and Implications for Market Structure*, July 2016, *available at* https://www.cfainstitute.org/-/media/documents/issue-brief/payment-for-order-flow.ashx    (last visited Jan. 15, 2021) (PFOF effectively banned by UK Financial Services Authority because it "creates a conflict of interest in brokers' best execution obligations to their clients"); UK FINANCIAL SERVICES AUTHORITY, *Finalised Guidance on the practice of 'Payment for Order Flow,'* May 2012, *available at* https://www.fca.org.uk/publication/finalised-guidance/fg12-13.pdf (last visited Jan. 15, 2021) ("PFOF arrangements create a clear conflict of interest between the clients of the firm and the firm itself. Therefore, it is unlikely to be compatible with … best execution rules").

26.     Despite the inherent conflict of interest, Robinhood began routing customer orders directly and solely to principal trading firms using the 80/20 PFOF/price improvement split arrangement in September 2016.   Around this time, Robinhood formed a "Best Execution Committee," which met at least once per month and included Robinhood's General Counsel.  In 2017, Robinhood developed a proprietary routing algorithm designed to make the principal

trading firms Robinhood had arrangements with compete for order flow by routing customer orders to the principal trading firm that provided the most price improvement for that stock over the last 30 days. This routing algorithm, however, did not take into account Robinhood's high PFOF rates or execution prices that may be available at venues that did not agree to pay those rates. Thus, despite Robinhood's "Best Execution Committee" and smart algorithm, from October 2016 through June 16, 2020, Robinhood was not obtaining much price improvement on its customer orders in equity securities, particularly on orders of 100 shares or more.

27.     Contrary to its name, Robinhood's Best Execution Committee did not conduct adequate, regular, and rigorous reviews to ensure that Robinhood was satisfying its best execution obligations. The Committee took no steps to determine whether Robinhood's high PFOF rates were negatively impacting the execution prices its customers received.  In fact, until October 2018, the Committee did not even consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally. In October 2018, the Committee learned that, for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's quality was worse than that of its competitors.

28.     By March 2019, Robinhood had conducted a more in depth analysis, and learned that its execution quality and price improvement metrics were substantially worse than its competitors', including the percentage of orders receiving price improvement and the amount of the price improvement (per order, per share, and per dollar).  The internal report stated "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin."  And the margin widened the larger the order.  For example, Robinhood learned that for most orders of more than 100 shares, customers would be better off trading at another broker-dealer, where they would get additional price improvement exceeding the $5 per-order commission costs those broker-dealers would have charged them.  For orders over 500 shares, the average Robinhood customer lost more than $15 per order in price improvement compared to Robinhood's competitors.  That loss rose to more than $23 per order

for orders over 2,000 shares.  As a result, between October 2016 and June 16, 2020, Robinhood orders lost over $34.1 million in price improvement compared to the price improvement they would have received had they been placed at competing retail broker-dealers, even after the $5 per-order broker commission costs. In effect, for each trade executed during the Class Period, a better price was available and, but for Robinhood's conduct, Plaintiff and Class members would have received those better prices.

29.     Despite learning of Robinhood's poor execution quality and price improvement, the Best Execution Committee did nothing to ensure that Robinhood met its best execution duty, and from October 2016 through June 16, 2020, when Robinhood implemented all recommendations of an independent consultant as required by a Letter of Acceptance, Waiver and Consent entered into between Robinhood and FINRA, Robinhood failed to achieve best execution quality while at the same time making misrepresentations, omitting material information, and actively concealing its revenue sources and poor execution quality from its clients.

**C.     Robinhood's Misrepresentations, Omissions, and Concealment of Its Revenue Sources and Poor Execution Quality.**

30.     In 2014, Robinhood posted an FAQ page on its website, discussing, *inter alia*, "How does Robinhood make money?"  Robinhood answered that it anticipated receiving PFOF. However, after Robinhood published the FAQ page, media began criticizing PFOF, so Robinhood removed the PFOF discussion from its FAQ page in December 2014 and moved it to a separate page dedicated to PFOF.

31.     The new page stated that Robinhood's revenue from PFOF was "indirect" and "negligible" and promised clients that if that changed, Robinhood would inform them on the "How does Robinhood make money" FAQ page.

32.     By the end of 2016, Robinhood was generating a significant amount of revenue and it knew that the majority of that revenue (more than 80%) came from PFOF.  However, contrary to what the company originally said in its PFOF FAQ, it did not disclose this to its customers, either on its website or through its customer service agents who it uniformly instructed

to "avoid" talking about PFOF and that it was "incorrect" to identify PFOF in response to customer inquiries regarding how Robinhood makes money.  Nor did Robinhood revise its customer agreements which simply stated "[t]he nature and source of any payments or credits received by Robinhood in connection with any specific transactions will be furnished upon written request."  Instead, sometime in 2016 Robinhood removed all mention of PFOF from its website.

33.     In 2016 and 2017, Robinhood updated its FAQ page to disclose two other, smaller revenue sources: subscription-based memberships and interest on securities landing.  Still no mention was made of PFOF, Robinhood's largest revenue source.

34.     Even when customers directly asked about Robinhood's revenue, they were given false, misleading, and incomplete information.  Robinhood instructed its customer service agents to direct customers to and to respond using the language on the "How Robinhood Makes Money" FAQ page – which omitted PFOF as one of the company's revenue sources.

35.     When Robinhood negotiated its 80/20 PFOF arrangements, it did not disclose to its clients that it had agreed to accept less price improvement than what the principal trading firms were offering in order to receive a higher rate of PFOF for itself.

36.     Robinhood did disclose some information about its PFOF revenue as required in SEC-mandated reports pursuant to Rule 606, which it posted on the "Disclosure Library" page of its website with other legally-mandated disclosures.  But the page and reports were not featured as part of its communication strategy, unlike the "How Robinhood Makes Money" FAQ page, a link to which was included on Robinhood's home-page and referred to by customer service agents.  Retail customers are not likely to have seen this information or understood it.

37.     Robinhood effectively concealed its receipt of PFOF from its customers by burying it in the form disclosure page of its website until September or October 2018, when Robinhood added PFOF to the list of revenue sources on the "How Robinhood Makes Money" FAQ page.

38.     But even then, Robinhood did not disclose the percentage of its revenue derived from PFOF arrangements, their negative effect on the price improvement realized for its customers' trades, and the poor execution quality that resulted.  Instead, Robinhood hid these material facts from its customers.  The new FAQ page stated that Robinhood's "execution quality and speed matches or beats what's found at other major brokerages[,]" despite Robinhood's knowledge that its execution quality was significantly inferior to that of its competitors. Robinhood only removed that claim in June 2019 after the Commission's Office of Compliance Inspections and Examinations raised concerns about it, but its failure to fulfill its duty of best execution continued throughout the Class Period.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff seeks relief on behalf of himself and as a representative of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. Rules 23(a) and (b)(3), Plaintiff seeks certification of a Nationwide class defined as follows:

> All persons who used Robinhood's brokerage services between September 1, 2016 and June 16, 2020 to place investment orders in connection with which Robinhood received payment for order flow (the "Class").

40.     In the alternative, Plaintiff seeks certification pursuant to Fed. R. Civ. P. Rules 23(a) and (b)(3) of a California-Only class defined as follows:

> All California citizens who used Robinhood's brokerage services between September 1, 2016 and June 16, 2020 to place investment orders in connection with which Robinhood received payment for order flow (the "Class").

41.     Excluded from the Classes are Robinhood and any of its affiliates, parents, or subsidiaries; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

42.     Plaintiff hereby reserves the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

43.     The proposed Classes meet the criteria for certification under Rules 23(a) and (b)(3).

44. **Numerosity. Fed. R. Civ. P. 23(a)(1).**      The members of the Classes are so numerous that the joinder of all members is impractical.   Robinhood had some 13 million user accounts in November 2020.  Plaintiff is informed and believes that there are at least hundreds of thousands of Class members who have been damaged by Robinhood's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff but can be readily ascertained from Robinhood's records.

45. **Commonality. Fed. R. Civ. P. 23(a)(2).**      This      action      involves      common questions of law and fact, which predominate over any questions affecting individual Class members.   These common legal and factual questions include, but are not limited to, the following:

    a.     whether Robinhood violated the federal securities laws;

    b.     whether Robinhood violated California securities laws;

    c.     whether Robinhood' misrepresentations and omissions discussed above are false, misleading, or reasonably likely to deceive;

    d.     whether Robinhood violated the UCL and CLRA;

    e.     whether Robinhood' conduct constitutes breach of fiduciary duties and/or the duty of best execution; and

    f.     whether Plaintiff and Class members are entitled to appropriate remedies, including damages and restitution.

46. **Typicality. Fed. R. Civ. P. 23(a)(3).**      Plaintiff's claims are typical of those of other Class members.  All claims depend on Robinhood's uniform course of conduct described herein, and any factual differences in individual Class members' claims are rooted in the same cause.  Plaintiff's damages and injuries are akin to other Class members, all of those injuries and damages arise from Robinhood's uniform conduct, and Plaintiff seeks relief consistent with the relief sought by the Classes.

47. **Adequacy. Fed. R. Civ. P. 23(a)(4).**      Plaintiff is an adequate representative of the Class because he is a member of the Classes he seeks to represent; is committed to

pursuing this matter against Robinhood to obtain relief for the Classes; and has no conflicts of interest with the Class members.  Moreover, Plaintiff's counsel are competent and experienced in litigating class actions, including litigation of this kind.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class members.

48.     **Superiority. Fed. R. Civ. P. 23(b)(3).**     A class action is superior to all other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation.  The Classes are largely comprised of individuals new to investing, not large institutional investors. Accordingly, the damages suffered by Plaintiff and Class members are relatively small compared to the burden and expense required to individually litigate their claims against Robinhood, and thus, individual litigation to redress Robinhood's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system, increase the delay and expense to all parties, and create the potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

49.     Unless a Class is certified, Robinhood will retain monies received as a result of its conduct that were taken from Plaintiff and Class members.

**COUNT I**
**Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)**
**and Rule 10b-5**

50.     Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

51.     Section 10(b) of the Securities Exchange Act (the "Act"), as effectuated by Rule 10b-5, makes it "unlawful for any person … [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading." Defendants are persons under the Act.

52.     Pursuant to the Act, Robinhood had a duty to disseminate timely, accurate, and truthful information about its routing of customer orders and any effect that its routing procedures have, or are likely to have, on the execution quality of its clients' orders.

53.     Robinhood also had a duty of best execution pursuant to the Act. Robinhood's duty of best execution legally required it to seek the best price reasonably available for its customers' orders.

54.     During the Class Period and in connection with the purchase or sale of securities, Robinhood knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud, deceit, and/or manipulation upon Plaintiff and Class members, uniformly denying them best execution quality.

55.     In connection with the purchase or sale of securities, Robinhood participated directly or indirectly in making numerous public false and misleading statements of fact including in its Customer Agreements and on the Robinhood website that were designed to convince the public, including Plaintiff and Class members, that Robinhood was providing trading services at best execution prices, when it knew that it was not. Robinhood further omitted material facts necessary to make the statements truthful and not misleading in light of the circumstances under which they were made. These material statements and omissions were false and misleading with regard to Robinhood's order routing practices and the means by which Robinhood was profiting from its clients through undisclosed, but systematic, high PFOF at the expense of price improvements otherwise available to its clients.

56.     Robinhood had actual knowledge of the materially false and misleading statements and material omissions alleged herein or, at a minimum, acted with reckless disregard for the truth of same.

57.     Robinhood further employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities, including by routing orders only to third

party trading firms that agreed to Robinhood's high PFOF demands, despite this knowingly causing Plaintiff and Class members to receive inferior execution rates.

58.     Robinhood had actual knowledge of, or recklessly disregarded, the plan and scheme by which Robinhood routed orders for the purpose of extracting high PFOF, despite this practice uniformly failing to satisfy Robinhood's duty of best execution.

59.     This scheme by Robinhood, including the materially misleading statements and omissions thereunder, was intended to, and throughout the Class Period did:   (i) deceive Robinhood's clients, including Plaintiff and Class members, including by causing its clients to reasonably expect that they would receive best execution; (ii) cause Plaintiff and Class members to engage in a broker-client relationship with Robinhood in reliance on the materially false and misleading statements and omissions, which they otherwise would not have done; (iii) cause Plaintiff and Class members to place trade orders which they otherwise would not have placed; and (iv) deprive Plaintiff and Class members of the best execution of their trade orders, which received inferior execution quality compared to the prices available on the market through other brokerages.

60.     For each of Plaintiff and Class members' trades executed during the Class Period, a better price was available than the price they received through Robinhood and, but for Robinhood's wrongdoing alleged herein, Plaintiff and Class members would have received those superior prices.

61.     Robinhood knew that by failing to provide its clients with the best execution of their trade orders, Plaintiff and each Class member would, and did, incur economic harm.

62.     Robinhood's unlawful conduct also impacted the price at which each stock on the market was traded, thus injuring every investor who trades in any particular security.

63.     Robinhood has knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Act and Rule 10b-5 promulgated thereunder. Robinhood was able to, and did, directly or indirectly control the content of its misleading statements and omissions.

**COUNT II**
**Violation of California's Corporations Code §§ 25401 and 25504.1**

64. Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

65. California Corporations Code § 25401 prohibits the sale of securities "by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading." Section 25501 creates a private cause of action for violations of section 25401.

66. Section 25504.1 provides that "any person who materially assists in any violation of Section … 25401, … with intent to deceive or defraud, is jointly and severally liable with any other person liable … for such violation."

67. Defendant Robinhood Financial LLC and Robinhood Securities, LLC were in privity with Plaintiff and Class members because they executed trade orders for Plaintiff and Class members pursuant to Customer Agreements. Defendant Robinhood Markets, Inc. materially aided Robinhood Financial LLC and Robinhood Securities, LLC in selling and offering to sell securities by communicating the false and misleading statements and omissions made on the Robinhood website operated by Defendants.

68. Robinhood sold securities by means of the materially false and misleading representations and omissions described herein, and acted with an intent to deceive and/or defraud Plaintiff and Class members. Specifically, Robinhood, indirectly or directly, promised Plaintiff and Class members in its Customer Agreements and on the Robinhood website that it was providing investment-related services subject to federal and state securities laws and regulation at best execution prices and "negligible" PFOF, when they knew that they were not. Robinhood further omitted material facts necessary to make the statements truthful and not misleading in light of the circumstances under which they were made. These statements and omissions were materially false and misleading with regard to Robinhood's order routing practices and the means by which Robinhood was profiting from its clients through undisclosed,

but systematic, high PFOF, and were made with the intent to deceive Plaintiff and Class members about the nature of Robinhood's trading services.

69.    Plaintiff did not know the truth about Robinhood's false and misleading material statements and omissions.   Robinhood, on the other hand, knew of its false and misleading material statements or omissions or, at a minimum, failed to exercise reasonable care with regard to same.

70.    This scheme by Robinhood, including the materially misleading statements and omissions thereunder, was intended to, and throughout the Class Period did:   (i) deceive Robinhood's clients, including Plaintiff and Class members, including by causing their clients to reasonably expect that they would receive best execution; (ii) cause Plaintiff and Class members to engage in a broker-client relationship with Robinhood in reliance on the materially false and misleading statements and omissions, which they otherwise would not have done; (iii) cause Plaintiff and Class members to place trade orders which they otherwise would not have placed; and (iv) deprive Plaintiff and Class members of the best execution of their trade orders, which received inferior execution quality compared to the prices available on the market through other brokerages.

71.    As a result of Robinhood's conduct, Plaintiff and Class members were injured because, for each of Plaintiff and Class members' trades executed during the Class Period, a better price was available than the price they received through Robinhood and, but for Robinhood's wrongdoing alleged herein, Plaintiff and Class members would have received those superior prices.

72.    Plaintiff and Class members are entitled to damages.

## COUNT III
**Violation of the Consumer Legal Remedies Act – Cal. Civil Code §§ 1750 *et seq.***

73.    Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

74.     Plaintiff brings this cause of action pursuant to the Consumer Legal Remedies Act, California Civil Code §§ 1750, *et seq.* (the "CLRA").

75.     Plaintiff is a "consumer" as defined by the CLRA § 1761(d).  The securities at issue are "goods" as defined by the CLRA § 1761(a).  Robinhood's services are "services" as defined by the CLRA § 1761(b).

76.     By use of the false and misleading statements and omissions set forth herein, Robinhood violated the CLRA by engaging in the following practices proscribed by the CLRA § 1770(a) in transactions with Plaintiff and Class members which were intended to result in, and did result in, the sale of securities and services:

(5)     Representing that goods or services have … characteristics, … [and] benefits … that they do not have …;

(7)     Representing that goods or services are of a particular standard, quality, or grade … [when] they are of another;

(9)     Advertising goods or services with an intent not to sell them as advertised;

(13)    Making false of misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions;

(14)    Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve; and

(16)    Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

77.     Pursuant to § 1782(d) of the CLRA, Plaintiff and Class members seek a Court order for restitution and disgorgement.

78.     Pursuant to § 1782 of the CLRA, Plaintiff notified Robinhood in writing by certified mail of the particular violations of § 1770 and demanded that Robinhood rectify the problems associated with the actions detailed above and give notice to all affected consumers of Robinhood's intent to so act.  A copy of the letter is attached hereto as Exhibit A.

79.     If Robinhood fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of

written notice pursuant to § 1782 of the CLRA, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages, as appropriate.

80.     Robinhood's conduct is fraudulent, wanton, and malicious.

81.     Pursuant to § 1780(d) of the CLRA, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

**COUNT IV**
**Breach of Fiduciary Duty**

82.     Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

83.     As providers of financial services and registered securities investment dealers, Robinhood was a fiduciary to Plaintiff and Class members, and owed them the highest good faith and integrity in performing financial services and acting as securities brokers on their behalf.

84.     Plaintiff and Class members placed their trust and confidence in Robinhood to handle their investments, which Robinhood accepted, thereby creating a fiduciary relationship giving rise to certain fiduciary duties, including but not limited to those duties described in its Customer Agreements and those imposed as matter of law, including: the duties of undivided loyalty, to refrain from engaging in unfair transactions, to fully disclose all material facts, to refrain from obtaining or accepting any advantage over Plaintiff and Class members, and to act in accordance with its duty of best execution.

85.     Robinhood also maintains discretionary control over customer accounts, thus assuming all the fiduciary responsibilities associated with its discretion to exercise trades and other transactions with or without customer direction.

86.     Robinhood breached its fiduciary duties to Plaintiff and Class members by, *inter alia*, failing to provide best trade execution quality by prioritizing its profits through PFOF at the expense of the price improvements otherwise available on its customers' trades.

87.     Robinhood's conduct has caused Plaintiff and Class members harm, loss, and damages in an amount to be determined at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT V**
**Violation of Business & Professions Code §§ 17200, *et seq.***

88.     Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

89.     Plaintiff brings this cause of action pursuant to California's Business & Professions Code §§ 17200, *et seq.* (the "UCL").

90.     The UCL prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Professions Code § 17500.

91.     Robinhood has committed business acts and practices that violate the UCL by breaching its duties of best execution, undivided loyalty, good faith, and to refrain from unlawful conduct including disseminating unlawful, unfair, deceptive, untrue, and misleading advertising in connection with its sale of securities brokerage services, as described herein; and violating the various laws asserted herein.

92.     The conduct of Robinhood as alleged above also constitutes unfair competition in that the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

93.     Plaintiff and Class members have suffered injury in fact and lost money or property as a result of Robinhood's conduct because they engaged in a broker-client relationship with Robinhood in reliance on the materially false and misleading statements and omissions, which they otherwise would not have done, and placed trade orders which they otherwise would not have placed, which received inferior execution quality compared to the prices available on the market through other brokerages.  For each of Plaintiff and Class members' trades executed during the Class Period, a better price was available than the price they received through Robinhood and, but for Robinhood's wrongdoing alleged herein, Plaintiff and Class members would have received those superior prices.

94.    Plaintiff and Class members are entitled to restitution and all other relief this Court deems appropriate, consistent with the UCL § 17203.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for a judgment:

A.    Certifying the Classes as requested herein;

B.    Awarding damages, restitution and disgorgement of Robinhood's revenues to Plaintiff and Class members;

C.    Awarding attorneys' fees and costs; and

D.    Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial of his claims by jury to the extent authorized by law.

Dated: January 15, 2021

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.

*/s/Patricia N. Syverson*
Patricia N. Syverson (203111)
600 W. Broadway, Suite 900
San Diego, CA 92101
psyverson@bffb.com
Telephone:  (619) 798-4593

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Elaine A. Ryan *(To be Admitted Pro Hac Vice)*
Carrie A. Laliberte *(To be Admitted Pro Hac Vice)*
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone:  (602) 274-1100

THE PASKOWITZ LAW FIRM P.C.
Laurence D. Paskowitz *(To be Admitted Pro Hac Vice)*
208 East 51st Street, Suite 380
New York, NY 10022
lpaskowitz@pasklaw.com
Telephone:   (212) 685-0969

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that on January 15, 2021, I electronically filed the foregoing with the

4  Clerk of the Court using the CM/ECF system which will send notification of such filing to the

5  e-mail addresses denoted on the Electronic mail notice list

6      I certify under penalty of perjury under the laws of the United States of America that

7  the foregoing is true and correct.  Executed on January 15, 2021.

8                              /s/*Patricia N. Syverson*
                             Patricia N. Syverson (203111)
9                             BONNETT FAIRBOURN FRIEDMAN
                             & BALINT, P.C.
10                            600 W. Broadway, Suite 900
                             San Diego, CA 92101
11                            Telephone: (619) 798-4593

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28